Michael P. Lehmann (SBN 77152)
Christopher L. Lebsock (SBN 184546)
Bonny E. Sweeney (SBN 176174)
Bruce J. Wecker (SBN 78530)
Samantha J. Stein (SBN 302034)
**HAUSFELD LLP**
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeld.com
Email: clebsock@hausfeld.com
Email: bsweeney@hausfeld.com
Email: bwecker@hausfeld.com
Email: sstein@hausfeld.com

Michael D. Hausfeld (*pro hac vice* forthcoming)
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel: (202)-540-7200
Fax: (202)-540-7201
Email: mhausfeld@hausfeld.com

Eugene A. Spector
Jeffrey L. Kodroff
William G. Caldes
Jonathan M. Jagher
Len A. Fisher
(*pro hac vice* forthcoming)
**SPECTOR ROSEMAN KODROFF & WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
Email: ESpector@srkw-law.com
Email: JKodroff@srkw-law.com
Email: BCaldes@srkw-law.com
Email: JJagher@srkw-law.com
Email: LFisher@srkw-law.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| Craig Housenick, Ryan Margulis, Richard Rizzo, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        vs.<br><br>Qualcomm Incorporated, a Delaware Corporation,<br><br>        Defendant. | Case No. 5:17-cv-675<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS, STATE UNFAIR COMPETITION LAWS, AND THE COMMON LAW OF UNJUST ENRICHMENT** |

1    Plaintiffs, by and through their undersigned attorneys, bring this proposed class action

2    and allege as follows:

3    **I.    INTRODUCTION**

4    1.    Plaintiffs and proposed class members are purchasers of cellular telephones

5    and other cellular devices, such as computer tablets.  In each such device, there is a modem

6    chipset (also called a baseband processor), which allows the device to communicate and

7    transmit voice and data across wireless networks controlled by wireless carriers, such as

8    Verizon or Sprint.  Plaintiffs bring this action against Defendant Qualcomm Incorporated

9    ("Qualcomm") for its anticompetitive conduct in acquiring and maintaining monopolies over

10   the modem chipset market and the licensing market for "standard essential patents" or "SEPs"

11   related to that technology.  As a result of Qualcomm's anticompetitive conduct, described

12   below, Qualcomm has charged device manufacturers an excessive and unlawful royalty on the

13   net selling price of each cellular device, which in turn has inflated the price paid by each end-

14   user purchaser of such devices.

15   2.    To communicate with an operator's network, a cellular device must contain a

16   modem chipset that complies with cellular communications standards that the network

17   supports.  Standard setting organizations ("SSOs"), comprised of device and device

18   component manufacturers as well as others, collaborate to set technology requirements

19   ("standards") to ensure mass interoperability among all system components.  Because a

20   standard requires that devices utilize a specific technology, standard-compliant devices will,

21   in some cases, infringe on certain patents for technology incorporated in the standard.  Such

22   patents are the aforementioned SEPs.  SEP holders benefit by obtaining licensing fees and

23   royalties associated with use of their technology.  Given the power such standards may give

24   SEP holders, before selecting a standard, SSOs consider various alternative technologies, and

25   importantly, also require that the developers of these standards agree to license their

26   technology on fair, reasonable, and nondiscriminatory ("FRAND") terms.  This ensures that

27   competitors may use the technology rather than being excluded from the market, and device

28   manufacturers may use the technology without being subjected to unreasonable terms.

1

3.     Qualcomm pioneered a technology known as Code Division Multiple Access ("CDMA"), which provided a means for cellular devices to communicate with their wireless networks.  Qualcomm was, and continues to be, the dominant producer of CDMA-modem chipsets and also holds the largest number of SEPs for CDMA technology.

4.     Qualcomm used its early leverage over CDMA technology to control the modem chipset supply (and SEPs related to that technology) to unlawfully acquire and maintain its monopolies over these markets.  CDMA became the standard used by Verizon and Sprint, which directly stemmed from Qualcomm's promise to SSOs that it would comply with FRAND requirements if the SSOs adopted Qualcomm's CDMA technology as their standard, rather than basing the standard on other technologies that competed with CDMA. As a result, device manufacturers such as Apple Inc. ("Apple") had to incorporate Qualcomm's CDMA technology for its devices to communicate with Verizon and Sprint. Thus, having agreed to license its technology on FRAND terms, Qualcomm's technology has been incorporated into virtually every relevant cellular standard in the last several years. Qualcomm has targeted a total "service addressable market" that it claims was worth $23 billion in 2015 and will be worth about $100 billion in 2020.[1]

5.     Qualcomm, however, took unfair advantage of standard-setting process by taking and manipulating all of the benefits of that process while refusing to comply with the FRAND commitments it made to SSOs to induce them to select Qualcomm's technologies for their standards.  Among other things, Qualcomm (1) refused to license, or alternatively imposed onerous restrictions on licenses of, its SEPs to competing chipset makers; (2) conditioned the supply of its CDMA chipsets on agreeing to Qualcomm's license agreements for its entire patent portfolio, including non-SEPs; (3) entered into exclusive deals with certain cellular device manufacturers, such as Apple; and (4) ignored the requirements of SSOs to license its SEPs to patent users on FRAND terms to extract unreasonably high, unilaterally determined royalty payments.

---

[1] Paige Tanner, *Qualcomm Is Targeting $100 Billion Market By 2020*, Market Realist (Mar. 16, 2016), http://marketrealist.com/2016/03/qualcomm-targeting-100-billion-market-2020/.

CLASS ACTION COMPLAINT

6.      Plaintiffs and the class of persons they seek to represent have been harmed by paying supracompetitive prices for the cellular devices they purchased.  Qualcomm "parlayed its pioneering role in cellular technology into a patent-licensing business that generates most of its profits.  Qualcomm charges a royalty on nearly every smartphone made, whether or not the device uses its chips."[2]  Qualcomm admits in its Form 10-Q filed on June 29, 2016 with the Securities & Exchange Commission ("SEC") that "[r]oyalties are generally based upon a *percentage of the wholesale (i.e., licensee's) selling price of complete licensed products*, net of certain permissible deductions (including transportation, insurance, packing costs and other items)."  (Emphases added).  Qualcomm typically charges cellular device manufacturers up to 5% of their product's wholesale price—around $20 on a $400 phone.

7.      Qualcomm's anticompetitive conduct has been investigated and met with condemnation by regulators around the world.  On September 9, 2009, the Japanese Fair Trade Commission ("JFTC") issued a cease and desist order against Qualcomm on the grounds that Qualcomm had violated its FRAND obligations.  On February 10, 2015, the Chinese National Development & Reform Commission ("NDRC") found that Qualcomm had abused its monopoly power and restricted competition in violation of the country's Anti-Monopoly Law, fining Qualcomm $975 million.  On December 21, 2016, the Korea Fair Trade Commission ("KFTC") fined Qualcomm $854 million (the largest fine in its history) for abuse of market dominance and anticompetitive conduct with respect to its licensing practices.

8.      Most recently, on January 17, 2017, the United States Federal Trade Commission ("FTC") filed a civil suit against Qualcomm in this Court on January 17, 2017, challenging Qualcomm's unlawful maintenance of a monopoly in baseband processors and alleging Qualcomm has excluded competitors and harmed competition—to the detriment of consumers who, as a result, paid increased prices for cellular devices.  *See Federal Trade Commission v. Qualcomm Inc.*, Case No. 17-cv-220-LHK (N.D. Cal., filed Jan. 17, 2017).

---

[2] Don Clark, *Qualcomm's Main Profit Driver is Under Pressure*, The Wall Street Journal (Apr. 13, 2015), http://www.wsj.com/articles/qualcomms-main-profit-driver-is-under-pressure-1428967051.

9.      The FTC's action has also spurred Apple to file an antitrust, intellectual property, and contract suit against Qualcomm.  *See Apple Inc. v. Qualcomm Inc.*, Case No. 17-cv-0108-GPC/NLS (S.D. Cal., filed Jan. 20, 2017).  In addition, Apple has commenced a $145 million patent action against Qualcomm in a Chinese intellectual property court.[3]

10.     Plaintiffs bring this action on behalf of themselves and others similarly situated to recover for their injuries resulting from Qualcomm's violations of Sections 2 and 3(b) of the Sherman Act, as well as violations of state antitrust and consumer protection laws. Plaintiffs seek monetary damages, injunctive relief, and any other available remedies to which they are entitled to as a result of Qualcomm's unlawful conduct.

## II.      PARTIES

### A.   Plaintiffs

11.     Plaintiff Craig Housenick is a resident of California.  Mr. Housenick purchased an Apple iPhone 6 Plus for personal use and not for resale.

12.     Plaintiff Ryan Margulis is a resident of Illinois.  Mr. Margulis purchased an Apple iPhone 6 Plus for personal use and not for resale.

13.     Plaintiff Richard Rizzo is a resident of Florida.  Mr. Rizzo purchased an Apple iPhone 6 Plus for personal use and not for resale.

### B.   Defendant

14.     Defendant Qualcomm is a Delaware corporation having its principal place of business at 5775 Morehouse Drive, San Diego, California 92121.  Qualcomm develops, designs, licenses, and markets its digital communications products and services worldwide, primarily through its two main business segments: Qualcomm CDMA Technologies ("QCT") and Qualcomm Technology Licensing ("QTL"), both wholly-owned subsidiaries of Qualcomm.  QCT deals with equipment sales while QTL grants licenses or otherwise provides rights to use portions of Qualcomm's patent portfolio.  QCT is operated by Qualcomm Technologies, Inc. ("QTI"), another wholly-owned subsidiary of Qualcomm.

---

[3] Brian Heater, *Apple files a $145 million patent suit against Qualcomm in China*, TC's Crunchboard (Jan. 25, 2017), https://techcrunch.com/2017/01/25/apple-qualcomm-2/.

CLASS ACTION COMPLAINT

15.     Qualcomm has extensive offices and employees throughout this District, including in San Francisco, Santa Clara, and Alameda counties,[4] and regularly conducts business here.  Many of its licensees are also located in this District.

**III.     JURISDICTION AND VENUE**

16.     This action arises under Sections 4 and Section 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for Qualcomm's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 3(b) of the Sherman Act, 15 U.S.C. § 3(b).  The Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1337.

17.     Plaintiffs also bring claims under state laws as set forth herein.  The Court has supplemental jurisdiction over these pendant state law claims under 28 U.S.C. §§ 1332(d) and 1367.  Each of Plaintiffs' state law claims arises out of the same factual nucleus as Plaintiffs' federal law claims.

18.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and Qualcomm transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here.  Qualcomm is engaged in interstate commerce, and its activities, including those activities that form the basis of this Complaint, substantially impact interstate commerce.

19.     Millions of relevant cellular devices were purchased at artificially inflated rates in this District.

**IV.     INTRADISTRICT ASSIGNMENT**

20.     Pursuant to the Northern District of California's Civil Local Rule 3-2(c-e), the intradistrict assignment should be to the San Jose Division.  This action arises in Santa Clara County because a substantial part of the events giving rise to these claims occurred there.  Additionally, Qualcomm has offices in Santa Clara and San Jose, and third parties that have information relevant to this action, including leading cellular device manufacturers and

---

[4] Qualcomm, *Offices & Facilities*, https://www.qualcomm.com/company/facilities/offices (last visited Jan. 16, 2017).

1    Qualcomm competitors, also have offices in Santa Clara County.  As noted above, the FTC

2    also filed a case in the San Jose Division concerning the same practices at issue in this case.

3    **V.      FACTUAL BACKGROUND**

4         **A.  SSOs, SEPs, and FRAND Obligations**

5         21.     Interoperability and compatibility are critical for most modern electronic

6    devices.  A wireless network (such as those operated by AT&T, Verizon, and Sprint) must be

7    able to communicate with cellular devices utilizing that cellular network and visa versa.

8    Accordingly, their infrastructure and design, and the components underlying that

9    infrastructure and design, must work together, regardless of which company made them.

10        22.     Cellular devices contain a modem chipset – the core electronic unit that allows

11   it to transmit and receive information (either voice telephone calls or data) to and from the

12   wireless network.  Specifically, these chipsets transmit information, via radio waves, to

13   cellular base stations.  Base stations, in turn, transmit information to and from telephone and

14   computer networks.  It is essential that all components involved in this transmission be able to

15   communicate seamlessly with one another.

16        23.     Because of the multitude of devices and technologies, device designers,

17   component manufacturers, and others have agreed to uniform standards to ensure the smooth

18   operation of the wireless network and the cellular devices that connect to it.  To achieve this,

19   wireless network carriers, chipset manufacturers, cellular device manufacturers, and others

20   have established SSOs, such as the European Telecommunications Standard Institute

21   ("ETSI"), the International Telecommunications Union ("ITU"), the Institute of Electrical and

22   Electronic Engineers ("IEEE"), and, in the United States, the Telecommunications Industry

23   Association ("TIA").

24        24.     SSOs collaborate to set technology requirements that ensure mass

25   interoperability among all system components.  The technology incorporated into a standard

26   is typically chosen from among different options.  Once incorporated and widely adopted, that

27   technology is not always used because it is the best or the only option; it is used because it is

28   necessary to comply with the standard.  Competition is eliminated as alternatives cannot

CLASS ACTION COMPLAINT

comply with the standard.  Additionally, to implement a technological standard, devices often need to incorporate a patented invention on which the standard is based.  These are the SEPs discussed previously.  Holders of patents essential to technology incorporated into a standard declare their patents as SEPs.  Consequently, to be compliant with the applicable standard, manufacturers of products using the patented technology generally need to license the SEP.

25.     Antitrust law recognizes that, under certain circumstances, collaboration by industry participants can increase competition, innovation, product quality, and consumer choice.  For example, in this context, collaboration allows consumers to be confident that cellular devices bought from different manufacturers will operate with each other and with the wireless network that they choose.  Similarly, common standards allow component manufacturers, carriers, and others in the industry to invest in technological advancement with confidence that their products will work with wireless networks.

26.     However, standards can pose challenges to device and device component manufacturers and can involve tradeoffs for consumers.  For example, a company implementing standards in a product must use certain mandated technologies, even where many viable, and perhaps even superior alternatives exist.  Once a standard is adopted, participants begin to make investments tied to the implementation of the standard.  Because these participants may face substantial switching costs in abandoning initial designs and substituting a different technology, an entire industry can become "locked in" to a standard.

27.     The adoption of SEPs into technological standards also enhances the potential for abuse by the patent owner.  "Patent hold-up" occurs when a SEP holder demands excessive royalties after companies are locked in to using a standard.  Where standardized technologies are covered by patents, companies that choose to implement a standard in their products have no choice but to license those patents (and accept the licensor's terms) or face a lawsuit if they use the technology without a license.  "Royalty stacking" arises when a standard implicates numerous patents.  These royalty payments "stack" on top of each other and, in turn, inflate the cost of the product to the consumer.  Royalty stacking can be a significant concern:

CLASS ACTION COMPLAINT

> The data show that royalty stacking is not merely a theoretical concern. Indeed, . . . we estimate potential patent royalties in excess of $120 on a hypothetical $400 smartphone—which is almost equal to the cost of device's components. Thus, the smartphone royalty stack across standardized and non-standardized technology is significant, and those costs may be undermining industry profitability—and, in turn, diminishing incentives to invest and compete.[5]

28.     To help alleviate these potential concerns, before agreeing to a particular standard, SSOs seek certain assurances from patent owners.  Specifically, SSOs request that SEP holders agree to license their patents on fair, reasonable, and non-discriminatory terms, referred to as a SEP holder's FRAND obligations.  For example, the IEEE asks SEP holders to pledge that they will grant licenses to an unrestricted number of applicants on "reasonable, and nondiscriminatory" (or "RAND") terms.  If a patent holder does not choose to make this promise, the SSOs select a standard without using the patented technology.

29.     FRAND obligations are designed to, among other things, prevent SEP holders from wielding control over essential technology and restricting competition, development, and research related to the standard.  SEP holders generally agree to FRAND terms because SSOs may exclude the holder's technologies from the standard if it does not agree to FRAND terms.  SEP holders also benefit from license fees and royalties they gain from cooperating with the SSO.

30.     The TIA has explained this point[6]:

> Market-driven **Open Standards** can help promote competition and innovation. Such standards are developed or ratified through a voluntary, open and consensus-based process.
>
> This process is defined by flexible policies that balance incentives to participate in and contribute to the formulation of standards. This process benefits users and consumers by the broad implementation of

---

[5] Joseph J. Mueller & Timothy D. Syrett, *The Smartphone Royalty Stack: Surveying Royalty Demands for the Components within Modern Smartphones* (May 29, 2014), https://www.wilmerhale.com/pages/publicationsandnewsdetail.aspx?NewsPubId=17179872441.

[6] TIA, *Approved 20 June 2008 by the Intellectual Property Rights Standing Committee of the TIA; TIA – A Leading Developer of Open Standards*, tiaonline.org (June 20, 2008), http://www.tiaonline.org/standards/about/documents/TIA-IPR_20080620-003_TIA_OPEN_STANDARDS-CLEAN_R4.pdf.

the resulting standards. One element of a voluntary, open and consensus-based process addresses the inclusion of patented technologies. The patent policies of standards organizations typically find a balance among differing interests. For example, implementers need to access and use patented technology included in the standard. Patent holders need to preserve their rights in a way that encourages them to contribute their innovative solutions to the standardization effort. "RAND" patent policies seek to provide this type of balance by helping to make that patented technology available to all on "reasonable and non-discriminatory" (i.e., RAND) terms and conditions.

31. As the United States Court of Appeals for the Third Circuit has also noted in a case against Qualcomm:

[A] standard, by definition, eliminates alternative technologies. When a patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology. Although a patent confers a lawful monopoly over the claimed invention, its value is limited when alternative technologies exist. That value becomes significantly enhanced, however, after the patent is incorporated in a standard. Firms may become locked in to a standard requiring the use of a competitor's patented technology. The patent holder's [intellectual property rights], if unconstrained, may permit it to demand supracompetitive royalties. It is in such circumstances that measures such as FRAND commitments become important safeguards against monopoly power.

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) (citations omitted).

32. When a SEP holder makes a FRAND promise to a SSO, implementers of the standard and their customers are third-party beneficiaries of that promise. FRAND obligations are more than a matter of a private contract between owners of technology, on the one hand, and SSOs and their other members (and implementers of the standard as intended third party beneficiaries), on the other. Instead, they are a critical precondition for antitrust tolerance of the industry collaboration on which standard-setting depends.

//

//

//

//

//

9

**B.  The Cellular Industry and Qualcomm's Dominance and Abuse of Power**

33.    Wireless standards have evolved in distinct generations, as consumers demanded more features and the industry responded by developing new innovations.  The following graphic, created by Qualcomm, shows the evolution of this technology.[7]



34.    For purposes of this case, following the first generation of cellular technology, the cellular industry developed second generation ("2G") cellular technology, from which two primary technology paths, or families of standards, emerged: (1) CDMA, which stands for "Code Division Multiple Access" and (2) "GSM," which stands for "global system for mobility."  CDMA is a channel access method used by various radio communication technologies.  It provides multiple access, where several transmitters can send information simultaneously over a single communication channel.  CDMA is used as the access method in many mobile phone standards.  GSM is another access method that is widely used in Europe and much of Asia, other than Japan and South Korea.  It utilizes a variation of time division multiple access.  Wireless network carriers operated under one or the other path, with, for example, Verizon and Sprint operating CDMA-path networks, while AT&T (formerly Cingular) and T-Mobile operated GSM-path networks.  The CDMA and GSM technology paths are not interoperable; in other words, equipment and technologies designed to be compatible with one standard cannot be used with the other standard.

---

[7] Qualcomm, *The Evolution of Mobile Technologies-1g-2g-3g-4g-lte*, (June 2014), https://www.qualcomm.com/media/documents/files/the-evolution-of-mobile-technologies-1g-to-2g-to-3g-to-4g-lte.pdf.

35.      Mobile devices are configured for a particular carrier, like AT&T or Verizon, and thus chipsets designed for a particular wireless device must conform to the standard technology chosen for the carrier's associated network.  In other words, CDMA-based networks demand chipsets that conform to the CDMA standard, and GSM networks require chipsets that conform to the GSM standard.  As a result, chipsets that comply with a given standard are not substitutes for chipsets that comply with other standards.  These chipsets likewise have different price and demand characteristics.  Downstream consumers purchase cell phones that include chipsets configured to operate using the standards chosen for a particular network, and once purchased, those consumers are inextricably tied to that standard for use of that device.

36.      Qualcomm pioneered the development of CDMA.  As a result, it controlled, and continues to control, the market for such technology, initially selling 90% of the CDMA-chipsets and continuing to control over 80% of the market.  Additionally, Qualcomm amassed many patents related to this standard.  Consequently, virtually any company that makes CDMA-based products—be they chipsets, phones, or infrastructure gear—has to obtain a license from Qualcomm.  Licensees pay a one-time fee for access to the patent portfolio and then royalties based on the final product sold by the licensee (*e.g.*, a smartphone).  Nearly all cellular companies have signed patent licenses with Qualcomm.

37.      Qualcomm's royalty stream has continued in the technologies standardized in third generation ("3G") cellular technology.  As with the prior generation of cellular technology, 3G evolved into two competing standards—but this time, *both* major standards were based on CDMA.  While an improved version of CDMA technology was developed, the Universal Mobile Telecommunications Service ("UMTS") standard was also developed.

38.      UTMS uses radio technology called WCDMA, which stands for "Wideband Code Division Multiple Access."  WCDMA technology allows for even further increased data speed and capacity. The UMTS standard was adopted by SSOs in the United States and elsewhere after evaluating alternative available technologies.  Qualcomm supplies some of the essential technology that ETSI included in the UMTS standard and holds intellectual property

11

1    rights ("IPRs"), such as patents, in this technology.  Among others, Qualcomm owns the

2    essential patents for the WCDMA standard.

3           39.    Consequently, CDMA-based technology has been adopted for *all* 3G wireless

4    standards throughout the world, and Qualcomm has in turn reaped more than $50 billion in

5    licensing revenues since 2000.  Indeed, Qualcomm charges a royalty on nearly every

6    smartphone made, whether or not the device uses its chips.

7           40.    ETSI and other SSOs required a commitment from vendors whose

8    technologies are included in the CDMA and other CDMA-based standards to license their

9    technologies on FRAND terms.  Qualcomm voluntarily and publicly agreed to accept

10   FRAND obligations, allowing it to license its patent portfolio to more than 155 companies,

11   and making its portfolio the most widely licensed in the industry.

12          41.    Indeed, in 2008, Qualcomm noted that it "has had a long standing policy of

13   broadly offering to license its standards essential patents for CDMA-based

14   telecommunications standards on terms and conditions that are fair, reasonable, and free from

15   unfair discrimination (FRAND), subject to reciprocity."[8]  But in that same press release,

16   Qualcomm publicly stated that "FRAND embodies a flexible approach that allows individual

17   licensors and licensees to negotiate the terms and conditions that are best suited to address

18   their respective commercial objectives" and "FRAND does not, and never has, prescribed

19   formulas for imposing cumulative royalty caps or proportional allocations of such royalty

20   caps."  This public statement was false.  As regulatory actions in multiple countries have

21   confirmed, Qualcomm has not abided by FRAND principles and its interpretation of FRAND

22   is not consistent with the obligations imposed on it by SSOs.  Qualcomm's promises to

23   comply with its FRAND obligations induced the SSOs to adopt its technology in the cellular

24   standards relevant to this action.  That conduct constituted deceit and fraud on the SSOs and

25   has injured Plaintiffs and others that have paid unreasonably high prices for cellular devices

26   as a result of Qualcomm's royalty demands.

27

28   _____

     [8] Qualcomm, *LTE/WiMax PATENT LICENSING STATEMENT* (Dec. 2008),
     https://www.qualcomm.com/documents/ltewimax-patent-licensing-statement.

42.     Qualcomm has abused its power over SEPs and the chipset supply to increase its own dominance in these markets and charge exorbitant royalties.  It has also abused its involvement in the SSOs, which set standards around Qualcomm technology and gave it the means to be as economically powerful as it has become.  Qualcomm's manipulation of this unique position is confirmed by multiple investigations of its conduct by trade and competition agencies around the world, as discussed below.

43.     The fourth generation of cellular technology ("4G") brought with it the "LTE" standard, which stands for Long Term Evolution of UMTS.  Nearly all cellular-enabled devices sold today support LTE for 4G service.  LTE is an "orthogonal frequency division multiple access" or "OFDMA"-based technology.  The LTE standard does not implement CDMA-based technologies.

44.     But like the UMTS technology before it, the arrival of LTE has not significantly impacted Qualcomm's control over the chipset market or the power of its licensing business.  Qualcomm holds a patent portfolio that applies to LTE technologies, including OFDMA, and over 90 companies (including Apple, LG, Nokia, and Samsung) have royalty-bearing licenses under Qualcomm's patent portfolio for use in OFDMA products (which do not implement any CDMA-based standards).  Additionally, many of the 4G-based cellular devices still implement CDMA-based technology to be backwards-compatible with other CDMA-based technologies that are still in use today.  Qualcomm exclusively supplies multimode CDMA-LTE chipsets that are backward compatible with CDMA.

45.     Consequently, with its power over CMDA technology, Qualcomm can and does use this as leverage to gain a greater share of the LTE-chipset market.  The following chart, prepared by the KFTC[9], demonstrates how Qualcomm has used control over CDMA-based technologies to acquire more power and control over the LTE chipset market.

---

[9] Qualcomm has provided an unofficial translation of the KFTC's press release on its website.  *See* KFTC Issued Press Release Dated December 28, 2016 – Unofficial English Translation, https://www.qualcomm.com/documents/kftc-issued-press-release-dated-december-28-2016-unofficial-english-translation (last visited Jan. 15, 2017).

CLASS ACTION COMPLAINT

1
2
3
4
5
6

**\<Qualcomm's Market Share Trend in Modem Chipset Market per Standard (Based on Revenues)\>**

|  | Yr 2008 | Yr 2009 | Yr 2010 | Yr 2011 | Yr 2012 | Yr 2013 | Yr 2014 | Yr 2015 |
|---|---|---|---|---|---|---|---|---|
| LTE | - | - | 34.2% | 58.8% | 94.5% | 96.0% | 84.8% | 69.4% |
| CDMA | 98.4% | 97.6% | 96.4% | 94.3% | 92.4% | 93.1% | 91.6% | 83.1% |
| WCDMA | 38.8% | 47.4% | 45.7% | 55.0% | 50.4% | 53.9% | 48.8% | 32.3% |

\* Source: Strategy Analytics

7
8
9
10
11
12
13
14
15
16
17
18
19

46.     In sum, Qualcomm holds a dominant position in the supply of chipsets that support CDMA, on which devices sold by Verizon and Sprint continue to depend.  It also holds a dominant position over the LTE-chipset supply.  Qualcomm has had a share of at least 80% or more of the CDMA chipset market for many years, and Qualcomm's share of the LTE chipsets market was above 90% between 2012 and 2014, and remains close to 70% today.  Qualcomm has leveraged its monopoly power over the supply of these chipsets to force device manufacturers into anticompetitive license agreements.  In other words, because these companies need CDMA- and LTE-based chipsets (controlled by Qualcomm) to be able to operate with CDMA- and LTE-based networks, Qualcomm has coerced device manufactures into accepting unreasonable and one-sided license terms dictated by Qualcomm.  As one commentator noted: "Qualcomm's status as both a chipset and IP vendor provides them with unparalleled leverage to collect licensing fees at a lower cost, simply by denying physical delivery of the chipsets until all fees are paid."[10]

20
21
22
23
24
25

47.     In its complaint, the FTC referred to this as the "no license, no chips" policy and said Qualcomm's "anomalous" position set it apart from other SEP holders in the industry.  As the FTC pointed out, this policy compelled potential SEP licensees to accept Qualcomm's terms and effectively precluded them from seeking judicial determinations of what an appropriate FRAND rate would be.  An example of such a determination is provided by *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 2111217 (W.D. Wash.

26
27
28

---

[10] Richard A. Taddonio, *Long – Qualcomm (NASDAQ: QCOM) - $68.42*, Columbia Business School 2015, https://www8.gsb.columbia.edu/valueinvesting/sites/valueinvesting/files/Taddonio_Richard-QCOM_0.pdf (last visited Jan. 16, 2017).

CLASS ACTION COMPLAINT

April 25, 2013), *aff'd*, 795 F.3d 1024 (9th Cir. 2015).  There, the SEP holder sought $6-$8 as a royalty rate for each gaming console manufactured by the plaintiff, and the district court, after a bench trial, ruled that the FRAND rate was only four cents per console.  The United States Court of Appeals for the Ninth Circuit upheld this determination, stating:

> The framework settled on [for making a FRAND determination] was "generally [consistent] with Motorola's approach." Applying that approach, the district court sought to approximate the royalty rates upon which the parties would have agreed by setting up a hypothetical negotiation between the parties. In doing so, the court carefully thought through the "factors an SEP owner and implementer would consider" in an actual negotiation directed at licensing a patent subject to RAND commitments. The court then discussed each of Motorola's fifteen H.264 patents and eleven 802.11 patents, considering the objective value each contributed to each standard, given the quality of the technology and the available alternatives as well as the importance of those technologies to Microsoft's business. Finally, the court performed a meticulous analysis of the testimony of eighteen witnesses, including executives, economists, and technology experts, to sort out which evidence to rely upon in determining the RAND royalty rate. Generally, the court credited Motorola's experts; where it did not, it provided reasoned explanations for not doing so.

795 F.3d at 1040 (first edit added; other edits in original).[11]

48.     Qualcomm also holds a dominant position in the SEP licensing market. Qualcomm has declared thousands of its patents as essential to CDMA, UMTS (WCDMA), and LTE standards.  Consequently, device and device component manufacturers are highly reliant on Qualcomm's SEPs, as each CDMA-, UMTS-, and/or LTE-related SEP is indispensable and irreplaceable for such manufacturers.  Qualcomm thus controls the licensing market for SEPs for CDMA, UMTS (WCDMA), and LTE technologies because manufacturers could not produce 3G and 4G devices without risking Qualcomm's initiating patent infringement lawsuits or seeking injunctions.

---

[11] *See also Realtek Semiconductor Corp. v. LSI Corp.*, No. C-12-3451-RMW, 2014 WL 2738226, at *6 (N.D. Cal. Aug. 16, 2014) ("The court hereby enters declaratory judgment that, upon Realtek's request for a license, to be in compliance with its RAND commitment, LSI must offer Realtek a license to the '958 Patent on RAND terms, including a royalty rate of 0.12% on the total sales of Realtek's products.").

49.      Qualcomm also uses its SEPs to require device and device component manufacturers and others to license its entire patent portfolio, which includes non-SEPs as well.  Non-SEPs refer to the patents that are either not essential to the realization of the standard or replaceable in their functionalities through design-around or avoidance design. There is no requirement that non-SEPs be licensed on FRAND terms.  By putting both SEPs and non-SEPs into one license, Qualcomm avoids its obligation to set license terms on a FRAND basis.  In doing so, Qualcomm can charge exorbitant royalties to any licensees that were forced to accept the packaged patent licenses.

50.      Qualcomm's licensing division brings in the vast majority of its profits, as illustrated in the graph below.  As such, it is critical for Qualcomm to maintain its licensing and related terms which have made it so profitable.



51.      Qualcomm has structured its business to maintain that licensing power.  In 2007, Qualcomm claimed publicly that any manufacturers using CDMA and UMTS/WCDMA technology "ha[s] to take out a license from Qualcomm" and that Qualcomm had been "pretty consistent in that model."[12]

---

[12] Qualcomm, Inc. at Jefferies Technology Conference (Oct. 2, 2007), at 5.

52.    Again in 2007, Qualcomm filed an *amicus* brief to the United States Supreme Court in which it described its licensing business model as follows:[13]

> Qualcomm has provided chipmakers nontransferable, worldwide, nonexclusive, restricted licenses to its portfolio of technically necessary patents through licensing agreements called ASIC [Application Specific Integrated Circuits] Patent License Agreements ("APLAs"). Chipmaker licensees typically pay Qualcomm an up-front license fee and a running royalty (paid quarterly) that is an agreed upon percentage of the defined Net Selling Price of the chips produced by the licensee. . . . An APLA provides the chipmaker-licensee with a license to *make* (or have made) its own ASICs. An APLA also provides the chipmaker-licensee with a restricted license to *sell* ASICs, but only to handset makers that the APLA defines to be an "Authorized Purchaser" for incorporation into fully assembled handsets. Authorized Purchasers are those handset makers that themselves have a license from Qualcomm through their own Subscriber Unit License Agreement ("SULA") to make, use and sell fully assembled handsets that, in the absence of a SULA, would infringe Qualcomm's patents. Importantly, by their express terms, APLAs do *not* grant a license to the chipmaker to *use* the ASICs—i.e., licensed chipmakers may not themselves use or pass on to others the right to use the chipmaker's ASICs to make, operate or sell handsets or any other product. APLAs explicitly state that the rights to use the ASICs to make, operate or sell handsets are only conferred by licensing agreements between Qualcomm and Authorized Purchasers (i.e., by SULAs). APLAs also expressly state that the license granted is only for the limited scope laid out, that no other license is granted or implied and that if the chipmaker-licensee sells ASICs to entities that are not Authorized Purchasers, the licensee has materially breached the APLA, which gives Qualcomm the right to terminate the agreement, including the license granted.
>
> As previously mentioned, producers of chips that are licensed through APLAs are granted, *inter alia*, a license to sell such chips only to handset makers that have entered into a SULA with Qualcomm. The standard terms of the SULAs have granted handset makers a nontransferable, worldwide, nonexclusive, unrestricted license to Qualcomm's patents to *make* (and have made), import and *use* handsets, and to *sell* (and offer to sell) completed handsets. SULAs typically provide for an up-front licensing fee to be paid to Qualcomm, along with a running royalty (paid quarterly) that is set as a percentage of the Net Selling Price of the handsets sold.

---

[13] Br. of Qualcomm Inc. as Amicus Curiae Supporting Respondent, *Quanta Comp., Inc. v. LG Elecs., Inc*., 533 U.S. 617 (2008) (No. 06-937), at 7-9.

53.     Even where Qualcomm sells its own chips, it requires purchasers to agree to its license agreements (as the FTC also noted)—which include the royalty rate based on the selling price of the device.  As Qualcomm explained in its amicus brief:

> Qualcomm is also in the business of developing and selling its own chips and software for wireless handsets. Qualcomm typically sells chips only to those handset manufacturers that are licensed to Qualcomm's patents under a SULA. Such chip sales are pursuant to Components Supply Agreements, in which handset makers agree to pay Qualcomm an agreed upon price for the chips sold by Qualcomm. Components Supply Agreements provide that the buyer-handset makers may only incorporate the chips purchased from Qualcomm into fully assembled handsets that are the subject of the SULA.

Essentially, cellular devices today are unable to connect to their network without paying a royalty (between 3-5% of the price of the entire device) to Qualcomm.[14]

54.     In short, the KFTC correctly identified three of Qualcomm's abusive and anticompetitive practices.  *First*, it did not provide SEP licenses to competing chipset companies while threatening to sue them under those patents if they compete against Qualcomm in the sale of chipsets.  *Second*, in selling chipsets to device and device manufacturers, Qualcomm demanded the execution and performance of its license agreements, thus leveraging its SEPs improperly.  And *third*, as a result, QTL coerced cellular phone makers to accept unilateral onerous terms.

55.     The KFTC depicted this conduct in the graphic below.[15]

---

[14] *See also* Subscriber Unit License Agreement, SEC.gov, https://www.sec.gov/Archives/edgar/data/1092492/000119312504140764/dex103.htm (last visited Jan. 16, 2017).

[15] *See supra* note 9.



56.     Qualcomm's policy of not licensing SEPs to competing chipset makers while insisting on licensing from cellular device manufacturers has entrenched its market power.

57.     Additionally, as device manufacturers cannot purchase chipsets from Qualcomm's competitors without also paying royalties to Qualcomm, to avoid such royalties, in some cases they agree to deal exclusively or near-exclusively with Qualcomm on the purchase of chipsets.  As the FTC explained in its recently-filed complaint, since 2007, Apple has entered into agreements to deal exclusively with Qualcomm in exchange for partial relief from Qualcomm's standard royalties.  Samsung has also entered into a similar exclusive dealing arrangement with Qualcomm.[16]  Qualcomm's exclusive supply arrangements with these device manufacturers denies other modem chipset suppliers the benefits of working with those manufacturers and hampers their development into effective competitors.

---

[16] Joel Hruska, *Qualcomm may have inked exclusive deal to put Snapdragon 820 in Samsung hardware*, ExtremeTech.com (Dec. 21, 2015) https://www.extremetech.com/mobile/219791-qualcomm-may-have-inked-exclusive-deal-to-put-snapdragon-820-in-samsung-hardware.

58.     As the KFTC explained, the size of the modem chipset market doubled since 2008, but Qualcomm's licensing practices caused no significant competitor to enter the market and rather caused many existing competitors to exit it[17]:



59.     The result has been a steady increase in Qualcomm's share of the chipset market.[18]

60.     This dominance in the chipset market, coupled with its ownership of critical SEPs built into several of the standards adopted by various SSOs, allowed Qualcomm to impose onerous license terms on device manufacturers, including exorbitant royalties that were not the result of the FRAND process.

61.     Qualcomm's royalty rates of 5% for most CDMA-based products and 3.25% for more recent LTE-based products are significantly higher than others in the industry.  The following chart demonstrates this in the LTE context as of 2010:

---

[17] *See supra* note 9.

[18] *Id.*

| Company | Announced LTE Rates | No. of Essential LTE Patents |
|---|---|---|
| 1. Qualcomm | 3.3% | 350 |
| 2. Huawei | 1.5% | 182 |
| 3. Ericsson | 1.5% | 146 |
| 4. Nokia | 1.5% | 142 |
| 5. Nortel | 1.0% | 46 |
| 6. Siemens | 0.8% | 32 |
| 7. Motorola | 2.3% | 16 |
| 8. Alcatel | 2.0% | 9 |

**Source:** Stasik, Eric, "Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunication Standards," *les Nouvelles*, September 2010, p. 116.

62. Qualcomm's rate base is also part of what makes Qualcomm's royalties so abusive. Qualcomm admits that its "[r]oyalties are generally based upon a *percentage of the wholesale (i.e., licensee's) selling price of complete licensed products*, net of certain permissible deductions (including transportation, insurance, packing costs and other items)." (Emphases added). Using the entire value of an end product is not a reasonable basis for calculating SEP-based royalties. As Apple has pointed out in its complaint, that rate base is calculated as a percentage of the value that Apple's own research, development, and innovation created in successive generations of iPhones. Indeed, around February 8, 2015, the IEEE updated its licensing policy, stating that a reasonable royalty should be the value attributable to a SEP, excluding the value of that SEP's inclusion in an IEEE standard, and that a factor to consider when determining the reasonable rate is the value of the relevant functionality of the smallest salable compliant implementation that practices the essential patent claim.[19] Qualcomm's power and leverage allows it force licensees to pay excessive rates on an unreasonable rate basis, which results in a royalty divorced from the actual value attributable to its technologies.

63. Qualcomm realizes the benefits of maintaining its licensing business and chipset business in one company and has rejected a push from an activist investor hedge fund to split the businesses into two companies. "The strategic benefits of the current structure will

---

[19] Deepa Sundararaman, *Inside The IEEE's Important Changes To Patent Policy*, Law360 (Apr. 3, 2015), https://www.law360.com/articles/637457/inside-the-ieee-s-important-changes-to-patent-policy.

1    best fuel Qualcomm's growth as we move through the upcoming technology transitions and

2    extend our technologies into new user experiences, services and industries," said Qualcomm's

3    CEO, Steve Mollenkopf.[20]

4            64.    The Apple complaint highlights another issue regarding Qualcomm's conduct.

5    Apple states at paragraph 93 of its complaint that "[s]pecifically, since 2011, Qualcomm has

6    conditioned billions of dollars in rebates on exclusivity or de facto exclusivity from Apple.

7    The monopoly power that Qualcomm enjoys today in the market for premium LTE chipsets is

8    directly related to Qualcomm's foreclosure of Apple's business to actual and potential

9    competitors in the premium LTE chipset market."[21]  Apple made a submission to the KFTC

10   in opposition to Qualcomm, and it notes at paragraph 160 of its complaint that "in restraining

11   Apple from initiating action or bringing concerns to law enforcement, Qualcomm conditioned

12   billions of dollars on Apple's silence before courts and regulators about Qualcomm's business

13   practices. And Qualcomm is now interpreting that agreement to retaliate against Apple for

14   responding to requests for information about Qualcomm's practices from competition

15   agencies, inhibiting law-enforcement review of Qualcomm's anticompetitive practices."

16       **C.  Regulators Investigate and Penalize Qualcomm's Abusive Conduct**

17           65.    While Qualcomm's abusive and unfair licensing practices have allowed it to

18   rake in billions of dollars in undeserved profits, these practices have not gone unnoticed.  In

19   the last few years, Qualcomm's royalty and licensing practices have come under scrutiny by

20   competition regulators from China, South Korea, Taiwan, Japan, Europe, and the United

21   States.  As described below, competition law enforcement authorities around the world have

22   concluded that Qualcomm's conduct as alleged herein is anticompetitive, unfair, and injurious

23   to consumers.

24   _____

25   [20] Mike Freeman, *Qualcomm Rejects Breakup Plan*, Los Angeles Times (Dec. 15, 2015),
     http://www.latimes.com/business/la-fi-qualcomm-20151215-story.html.

26   [21] This alone was arguably inconsistent with Qualcomm's FRAND promise to SSOs.  *See In*
27   *re Innovatio IP Ventures, LLC Patent Litig.*, No. 11 C 9308, 2013 WL 5593609, at *38 (N.D.
     Ill. Oct. 3, 2013) (a FRAND licensor "cannot discriminate between licensees on the basis of
28   their position in the market").

66.     For example, in November 2013, China's NDRC began to investigate Qualcomm's SEP licensing practices.[22]  On February 10, 2015, the NDRC found Qualcomm (1) controlled the SEP Licensing Market and the CDMA, WCDMA, and LTE baseband chip markets, and (2) abused that dominance by, among other things, charging excessive and unfairly high royalties to licensees that were "forced" to accept the packaged patent licenses.  The NDRC found Qualcomm's conduct constituted violations of provisions of the China Anti-Monopoly Law and, among other things, imposed a $975 million fine.[23]  It also ordered Qualcomm to materially lower the effective royalty by calculating its royalty not based on the total wholesale price of the device, but by calculating its royalty at 65% of the net selling price.[24]

67.     In July of 2009, the KFTC fined Qualcomm for abusing its dominant shares of the chipset market and the SEP license market.[25]  The $207 million fine was the largest the KFTC had then ever imposed on a company.  Undeterred by this fine, Qualcomm doubled down on its unlawful conduct.  In December of 2016, the KFTC issued a decision imposing its largest fine for Qualcomm's monopolistic conduct and mandating changes to Qualcomm's business model.  Among other things, the KFTC found Qualcomm had coerced patent license agreements from device manufacturers while holding hostage the supply of chipsets.  In other words, "Qualcomm actually used the threat of terminating the supply of modem chipsets as **negotiation leverage** in the process of license negotiations with handset companies."

---

[22] H. Stephen Harris, Jr., *An Overview of the NDRC Decision in the Qualcomm Investigation July 2015*, CPI Antitrust Chronicle (July 2015), available at http://www.winston.com/en/thought-leadership/an-overview-of-the-ndrc-decision-in-the-qualcomm-investigation.html.

[23] Qualcomm Press Release, *Qualcomm and China's National Development and Reform Commission Reach Resolution* (Feb. 9, 2015), https://www.qualcomm.com/news/releases/2015/02/09/qualcomm-and-chinas-national-development-and-reform-commission-reach.

[24] *See supra* note 22.

[25] *See* Yoonhee Kim & Hui-Jin Yang*, A Brief Overview of Qualcomm v. Korea Fair Trade Commission*, CPI Antitrust Chronicle, (Mar. 2015) https://www.competitionpolicyinternational.com/assets/Uploads/KimYangMar-151.pdf.

---

23

1 (Emphases in original).[26]  The KFTC found that Qualcomm's control over the chipset market

2 makes it so "handset companies have to bite the bullet and accept Qualcomm's license terms,

3 even if they are unfair, because if the modem chipset supply is suspended, handset companies

4 would face the **risk** of their **entire business** shutting down."  (Emphases in original).[27]

5       68.     Similarly, the European Commission ("EC") notified Qualcomm of its

6 investigation in October of 2014.  The EC issued a Statement of Objections against

7 Qualcomm in December of 2015, which alleged that Qualcomm's practices harmed chipset

8 competition and innovation.  Also, in December 2015, the Taiwan Fair Trade Commission

9 ("TFTC") notified Qualcomm of its investigation into the company's licensing behavior and

10 among other things, whether Qualcomm's royalty charges are unreasonable.

11       69.     Most recently, the United States FTC on January 17, 2017, filed an

12 enforcement action in this Court seeking a permanent injunction against Qualcomm to undo

13 and prevent its unfair methods of competition in violation of Section 5(a) of the Federal Trade

14 Commission Act, 15 U.S.C. § 45(a).  The FTC alleges, among other things, that

15 (1) Qualcomm withholds its baseband processors unless a customer accepts a license to

16 standard-essential patents on terms preferred by Qualcomm, including elevated royalties; (2)

17 Qualcomm has consistently refused to license its cellular standard essential patents to its

18 competitors, in violation of Qualcomm's FRAND commitments; and (3) Qualcomm entered

19 into exclusive dealing arrangements with Apple, which denied other baseband processor

20 suppliers the benefits of working with a particularly important cell phone manufacturer and

21 hampered their development into effective competitors.  *Id.*

22 **D.   Consumers are Harmed as a Direct Result of Qualcomm's Conduct**

23       70.     Qualcomm has abused its monopoly power to force device manufacturers and

24 other licensees to pay excessively high royalties, which has directly resulted in harm to

25 Plaintiffs and members of the proposed classes because it resulted in them paying higher

26 prices for their cellular devices than they would have in the absence of Qualcomm's conduct.

27

28 [26] *See supra* note 9.

[27] *Id.*

24

71.     Cellular devices are commodity products that consumers purchase as stand-alone products.  Consumers typically buy cellular devices either from the device manufacturer, such as Samsung or Apple, or through their network carrier, such as Verizon or Sprint.

72.     Device manufacturers and network carriers are subject to vigorous price competition, and as a result, they do not absorb Qualcomm's unlawful royalties, which are based on a percentage of the wholesale cost of the device itself.  Instead, they pass along some, or all, of the excessive royalty to consumers.  For instance, baseband processors cost as little as $10 to $13, but royalty demands associated with this component approach $60 for a $400 smartphone.[28]  This disparity between royalty demands and component costs results in increased costs for cellular devices, which are directly passed on to the consumer.

73.     Plaintiffs and members of the proposed classes have been forced to pay supra-competitive prices for cellular devices.  As Qualcomm bases its royalties on a percentage of the wholesale selling price of a complete licensed product, purchasers of cellular devices are only one level removed from the unlawful overcharge at issue here.  Accordingly, this case will not involve complicated pass-through analysis in multiple and complex distribution chains.  *In Re: Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1098 (N.D. Cal. 2007).

74.     Economic and legal scholars have recognized that unlawful overcharges of a component normally result in such pass-through costs.  Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the *Handbook of the Law of Antitrust*) – have observed that "in a multiple-level chain of

---

[28] *See supra* note 2; *see also* Nomura 2012 Smartphone Guide
http://www.patentoday.com/wp-content/uploads/2014/08/nomura_smartphone_poster_2012.pdf (last visited Jan. 15, 2017),

distribution, passing on monopoly overcharges is not the exception: it is the rule."[29]

Similarly, Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Certification), an economist who presented evidence in a number of indirect purchaser cases, said:

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers . . . . This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

75.     The FTC concurs in its complaint.  It states at paragraph 1 of its complaint that "Qualcomm has engaged in exclusionary conduct that taxes its competitors' baseband processor sales, reduces competitors' ability and incentive to innovate, and raises prices paid by consumers for cell phones and tablets."  Likewise, at paragraph 63 of its complaint, the FTC says that "[t]he policy skews Qualcomm's license negotiations with OEMs [Original Equipment Manufacturers] toward outcomes that raise the all-in prices that OEMs must pay on both Qualcomm baseband processors and those supplied by Qualcomm's competitors. These higher all-in prices reduce demand for competitors' processors and raise handset prices paid by consumers."  Similarly, at paragraph 87 of its complaint, the FTC observed that "[t]he incremental royalty that OEMs pay to Qualcomm operates as a 'tax' that raises OEMs' costs of using baseband processors supplied by Qualcomm's competitors, reduces demand for competitors' processors, and reduces the ability and incentive of competitors to invest and innovate. The tax thereby maintains Qualcomm's monopoly power and raises handset prices paid by consumers."  And at paragraph 95 of its complaint, the FTC noted that as a result of this "tax," "OEMs likely pass some portion of these higher prices on to consumers in the form of higher handset prices or reduced handset features."

---

[29] RG Harris & LA Sullivan, *Passing-On the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 269, 276 (1979).

76.     If Qualcomm was forced to stop abusing its monopoly power and charge a fair and reasonable royalty, consumers would receive better prices when purchasing cellular devices.

77.     The precise amount of the overcharge impacting the prices of cellular devices purchased by consumers is measureable through commonly accepted statistical and regression modeling.

## VI.     MARKET DEFINITION

78.     The relevant geographic market for purposes of this action is the United States and its territories.

79.     The relevant product markets are: (1) the market for CDMA-based and premium LTE modem chipsets ("Modem Chipset Market"), also known as baseband processors, which allow cellular devices to communicate with wireless networks and (2) intellectual property rights associated with SEPs ("SEP Licensing Market").  These two products – modem chipsets and SEP licenses – will be referred to collectively as the "Cellular Device Components" as both SEPs and modem chipsets are necessary components of the relevant cellular devices in this case which implement CDMA-based and/or premium LTE technologies (hereafter, the "Relevant Cellular Devices").

80.     Qualcomm directly participates in the market for the sale of the Relevant Cellular Devices to Plaintiffs and proposed class members by encumbering those devices through its licenses and related royalties.  Specifically, Qualcomm's royalty payments are calculated as a percentage of the wholesale price of the Relevant Cellular Devices, which in turn increases the retail price of those devices.  In other words, Qualcomm licenses technology essential to the operation of cellular devices and obtains monopoly rents tied directly to the entire wholesale price of the Relevant Cellular Devices.  The effect of Qualcomm's anticompetitive conduct is thus targeted at the cellular device as a whole and not components thereof.  Accordingly, because Qualcomm royalties are based on the wholesale selling price of complete licensed products, the patent rights owned by Qualcomm are inextricably intertwined with the Relevant Cellular Devices themselves.  As a result,

1    Qualcomm's anticompetitive acts, as alleged herein, directly distorted the price of the

2    Relevant Cellular Devices paid by Plaintiffs.

3        81.    Relatedly, Plaintiffs may not use the Relevant Cellular Devices without the

4    licenses provided by Qualcomm.  In the absence of the licenses, as recognized by federal

5    courts, Qualcomm has standing to sue any indirect users—not just direct infringers—of

6    cellular devices infringing on its patent rights.

7        82.    Plaintiffs' injuries are also inextricably intertwined with Qualcomm's

8    anticompetitive conduct with respect to modem chipsets and abuse of patent rights because it

9    has increased the cost to them of purchasing the Relevant Cellular Devices by, among other

10   things, (1) eliminating competition, (2) allowing Qualcomm to charge supracompetitive prices

11   for its chipsets and licenses, and (3) forcing device manufacturers to agree to onerous

12   licensing terms (with unreasonable royalties).

13   **VII.   CLASS ACTION ALLEGATIONS**

14       83.    Plaintiffs bring this action on behalf of themselves and as a class action under

15   Rule 23(a) and (b)(2), of the Federal Rules of Civil Procedure, seeking equitable and

16   injunctive relief, as well as under Rule 23(b)(3) for monetary relief under California law, on

17   behalf of the following class (the "Nationwide Class"):

18           All persons and entities in the United States who purchased, paid and/or
             provided reimbursement for some or all of the purchase price for
19           CDMA-based and/or premium LTE cellular devices ("Relevant
             Cellular Devices") from January 17, 2013 through the present.  This
20           class excludes: (a) Defendant, its officers, directors, management,
             employees, subsidiaries, and affiliates; (b) all federal and state
21           governmental entities except for those who have purchased Relevant
             Cellular Devices; (c) all persons or entities who purchased Relevant
22           Cellular Devices for purposes of resale or directly from Defendant; (d)
             any judges or justices involved in this action and any members of their
23           immediate families or their staff.

24

25       84.    Alternatively to the claim for nationwide monetary relief under California law,

26   Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a)

27   and (b)(3) of the Federal Rules of Civil Procedure seeking damages or monetary relief

28   pursuant to the common law of unjust enrichment and individual state antitrust, unfair

28

competition, and consumer protection laws for each of the states listed below (the "Indirect
Purchaser States")[30] on behalf of the following class (the "Damages Class"):

> All persons and entities in the United States who purchased, paid and/or
> provided reimbursement for some or all of the purchase price for
> CDMA-based, and/or premium LTE cellular devices ("Relevant
> Cellular Devices") from January 17, 2013 through the present.  This
> class excludes: (a) Defendant, its officers, directors, management,
> employees, subsidiaries, and affiliates; (b) all federal and state
> governmental entities except for those who have purchased Relevant
> Cellular Devices; (c) all persons or entities who purchased Relevant
> Cellular Devices for purposes of resale or directly from Defendant; (d)
> any judges or justices involved in this action and any members of their
> immediate families or their staff.

85.     The Nationwide Class and the Damages Class are referred to herein as the
"Classes."

86.     While Plaintiffs do not know the exact number of the members of the Classes,
Plaintiffs believe there are millions of members in each Class.

87.     Common questions of law and fact exist as to all members of the Classes.  This
is particularly true given the nature of Qualcomm's conduct to acquire and maintain
monopoly power, which was and is generally applicable to all the members of both Classes,
thereby making appropriate relief with respect to the Classes as a whole.  Such questions of
law and fact common to the Classes include, but are not limited to:

- Whether Qualcomm possessed monopoly power over the Cellular Device
  Components in the United States during the Class Period;

- Whether Qualcomm willfully acquired or maintained monopoly power
  over the Cellular Device Components in the United States during the Class
  Period;

- Whether Qualcomm possessed monopoly power in the Modem Chipset
  Market (a critical market underlying the Cellular Device Components) in
  the United States during the Class Period;

---

[30] The "Indirect Purchaser States" consist of Arizona, Arkansas, California, District of
Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada,
New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode
Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and
Wisconsin.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- Whether Qualcomm attempted to possess monopoly power in the Modem Chipset Market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

- Whether Qualcomm possessed monopoly power in the SEP Licensing Market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

- Whether Qualcomm attempted to possess monopoly power in the SEP Licensing Market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

- Whether Qualcomm tied the sale of its CDMA- and premium LTE- based chipsets to the purchase of license rights to its patent portfolio (including SEPs and non-SEPs);

- Whether Qualcomm tied the sale of its SEPs with the purchase of its non-SEPs;

- Whether Qualcomm's acquisition and maintenance of its monopolies in the Cellular Device Components violated Sections 2 and 3(b) of the Sherman Act, as alleged in the First Claim for Relief;

- Whether Qualcomm's conduct violated California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, as alleged in the Second Claim for Relief;

- Whether Qualcomm's conduct violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Third and Fourth Claims for Relief;

- Whether Qualcomm unjustly enriched itself to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Qualcomm, as alleged in the Fifth Claim for Relief;

- Whether the conduct of Qualcomm, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

- The effect of Qualcomm's unlawful conduct on the prices of Relevant Cellular Devices sold in the United States and its territories during the Class Period;

- The appropriate injunctive and related equitable relief for the Nationwide Class; and

- The appropriate class-wide measure of damages for the Damages Class.

30

88.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Qualcomm's wrongful conduct in that they paid artificially inflated prices for purchased indirectly from Qualcomm.

89.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

90.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

91.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

92.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## VIII.   CLAIMS AND PRAYER FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Monopolization in Violation of Sections 2 and 3(b) of the Sherman Act

93.     Plaintiffs repeat the allegations set forth above as if fully set forth herein.

94.     Qualcomm's conduct, as alleged herein, constitutes unlawful monopolization of the Cellular Device Components, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2), as well as Section 3(b) of Sherman Act (15 U.S.C. § 3(b)).

95.     General antitrust principles apply to conduct involving intellectual property is the same way that they apply to conduct involving any other form of property.

96.     Market power is the ability profitably to maintain prices above, or output below, competitive levels for a significant period of time.  Monopoly power is the ability to control prices and exclude competition in a given market.  If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power.

97.     Qualcomm has monopoly power in the Modem Chipset Market.  First, it has maintained high and durable market shares in this market.  Qualcomm controls the CDMA chipset supply, historically controlling over 90% of the CDMA modem chipset market, and at the lowest point still controlling 83% of this market.  Qualcomm also controls the Modem Chipset Market for LTE-based chipsets, controlling at relevant times up to 90% of the market, and today over 60% of the market.  Qualcomm still exclusively supplies multimode CDMA-LTE chipsets that are backward compatible with CDMA.  Second, there are substantial barriers to entry.  CDMA- and premium LTE- based technologies are not interchangeable with or substitutable for other technologies, and adherents to these technologies and their related standards have become locked-in.  Qualcomm also controls the patents, including SEPs, underlying CDMA-based technologies, and Qualcomm maintained this monopoly by, among other things, refusing to license to competitors and requiring purchasers of its chipsets to agree to its licenses for its patent portfolio.  Third, and relatedly, Qualcomm's monopoly power is shown by its demonstrated ability to repeatedly force device manufacturers to accept one-sided, unreasonable supply terms.  Among other things, Qualcomm has used its control over the CDMA chipset supply to require purchasers to agree to its license agreements and related terms, including excessively high royalty terms.

1    98.    Qualcomm also has monopoly power over the SEP Licensing Market.  SSOs

2 have selected standards based on technology for which Qualcomm owns the patents (based on

3 the condition that Qualcomm would supply its technology on FRAND terms).  As to market

4 share, Qualcomm holds virtually all of the SEPs—the essential patents—for CDMA standard-

5 based technologies, which underlie virtually all 3G devices and 4G-LTE devices which are

6 3G-compatible.  Qualcomm has licensed its patent portfolio for 3G cellular technologies to

7 more than 200 licensees.  As these patents are "essential" to the particular standards that

8 implement them, other patents and patented technology cannot replace or serve as an

9 alternative for Qualcomm's patents.  Qualcomm's market power over the SEP Licensing

10 Market is further demonstrated by Qualcomm's ability to leverage its control of its patents to

11 force device manufacturers to agree to unfair and unreasonable license agreements and terms,

12 including excessive royalties.  Because these manufacturers need to use Qualcomm's

13 technology for their devices to communicate with the major carrier networks, they are forced

14 to agree to Qualcomm's unfair and unreasonable licensing terms.

15    99.    As indicated, Qualcomm has acquired and maintained of its market power in

16 the Cellular Device Components (based on the modem chipsets and SEPs which underlie and

17 are incorporated into all the Relevant Cellular Devices), and it has done so through

18 anticompetitive means, including, but not limited to excluding competition and demanding

19 non-FRAND terms from licensees.

20    100.    Qualcomm thus holds market power over the Cellular Device Components

21 because it can encumber Relevant Cellular Devices with a royalty of its choice without other

22 firms competing to drive down these prices.  Specifically, Qualcomm's control over the

23 Cellular Device Components has allowed it to force license agreements on its competitors and

24 devices manufacturers, and those licenses allow Qualcomm to charge royalties of between

25 three to five percent (3-5%) of the wholesale price of the completed device.  In other words,

26 each Relevant Cellular Device sold with or based on Qualcomm technology is also

27 encumbered by Qualcomm's excessive royalties, which in turn increase the cost of the device

28 for consumers like Plaintiffs and members of the proposed Classes.

101.     There is no procompetitive justification for the anticompetitive conduct in which Qualcomm has engaged.  Qualcomm induced SSOs to use its technology and related patents in setting their standards on the promise that it would adhere to FRAND obligations. In doing so, other alternative (and potentially superior) technologies were not utilized by SSOs.  But Qualcomm has not met its FRAND obligations, and instead, has abused its monopoly power over the Cellular Device Components to force device manufacturers into licenses with unfair and unreasonable terms, including, but not limited to, excessively high royalty rates based on the selling price of the completed device rather than the value of Qualcomm's contribution to that device.  Qualcomm's acts have also likely harmed the development of cellular technology, as it forced out competitors, thus reducing innovation and competitive pricing.

102.     Plaintiffs and members of the proposed Classes were harmed as a direct result of Qualcomm's conduct, which increased the purchase price of their Relevant Cellular Devices.  Additionally, Qualcomm's conduct harmed innovation and competition, which harmed Plaintiffs in the quality and price of their Relevant Cellular Devices.

**SECOND CLAIM FOR RELIEF**

**Nationwide Claim For Violation of the Cartwright Act,**

**Cal. Bus. & Prof. Code §§ 16700, *et seq*.**

103.     Plaintiffs repeat the allegations set forth above as if fully set forth herein.

104.     During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of California Business and Professions Code sections 16700, *et seq*.  While Section 16700 does not reach solely unilateral conduct by a monopolist, it encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement.  That is what happened here.  Despite its FRAND obligations, Qualcomm unilaterally imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation.  This conduct constitutes a "combination" under the Cartwright Act.

34

105.    Qualcomm established an unlawful scheme by which it acquired and maintained monopoly power over the Cellular Device Components through anticompetitive means, including by excluding competition.

106.    The Relevant Cellular Devices are commodities.

107.    As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their Relevant Cellular Devices.

108.    It is appropriate to apply California antitrust law to the Nationwide Class. Qualcomm is headquartered in California, and Qualcomm subjected its competitors as well as device manufacturers that reside and do business in California to its unlawful conduct.  In doing so, Qualcomm reaped a significant portion of its profits as a result of its unlawful scheme from companies doing business in California.  Additionally, California is the most populous state in the country, for which it was foreseeable that substantial number of California consumers would be impacted by Qualcomm's unlawful behavior.

## THIRD CLAIM FOR RELIEF

### Nationwide Claim For Violations of Unfair Competition Law,

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

109.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

110.    Qualcomm's conduct constitutes a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which protects consumers from illegal, fraudulent and unfair business practices.

111.    Plaintiffs bring this claim on behalf of themselves, the Damages Class, and on behalf of the public as private attorneys general pursuant to Cal. Bus. & Prof. Code § 17204.

112.    As discussed above, Qualcomm's conduct constitutes violations of the Sherman Act and the Cartwright Act.  As such, Qualcomm's acts constitute unlawful conduct under section 17200.  Qualcomm unlawfully acquired and maintained its monopoly over the Cellular Device Components through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive

1    dealing arrangements with its customers to keep out competitors, and forcing device

2    manufacturers to license its patent portfolio.

3         113.    Qualcomm's conduct was deceptive because it induced SSOs to use its

4    technology on the promise it would comply with FRAND.  But after SSOs selected

5    Qualcomm's technology for their standards, Qualcomm refused to comply with its FRAND

6    promises.

7         114.    Qualcomm's conduct is also unfair to Plaintiffs and members of the proposed

8    Classes because as a direct result of its acts described above, Plaintiffs were charged more for

9    their Relevant Cellular Devices than they would have but for Qualcomm's conduct.

10        115.    Plaintiffs on behalf of themselves and the proposed Classes seek and are

11   entitled to all forms of relief available under California's Unfair Competition Law, including

12   but not limited to restitution and disgorgement from Qualcomm of all earnings, profits,

13   compensation, benefits and other ill-gotten gains obtained as a result of its conduct in

14   violation of Business & Professions Code § 17200 *et seq.*

15        116.    It is appropriate to apply California antitrust law to the Nationwide Class.

16   Qualcomm is headquartered in California, and Qualcomm subjected its competitors as well as

17   device manufacturers that reside in California to its unlawful conduct.  In doing so,

18   Qualcomm reaped a significant portion of its profits as a result of its unlawful scheme from

19   companies doing business in California.  Additionally, California is the most populous state in

20   the country, for which it was foreseeable that substantial number of California consumers

21   would be impacted by Qualcomm's unlawful behavior.

22                        **FOURTH CLAIM FOR RELIEF**

23            **Violations of State Antitrust and Restraint of Trade Laws**

24        117.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

25        118.    In the event that the Court does not apply California law on a nationwide basis,

26   Plaintiffs allege the following violations of state antitrust and restraint of trade laws in the

27   alternative.

28

1    119.    Defendant Qualcomm's anticompetitive acts described above were knowing,

2    willful, and constitute violations or flagrant violations of the following state antitrust statutes.

3    120.    Arizona: Qualcomm's monopolization and anticompetitive conduct has

4    restrained trade in violation of Arizona Revised Statutes §§ 44-1401, *et seq*.  During the Class

5    Period, Qualcomm's illegal conduct substantially affected Arizona commerce.  As a direct

6    and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

7    Damages Class have been injured in their business and property and are threatened with

8    further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

9    violation of Ariz. Rev. Stat. §§ 44-1401, *et seq*.  Accordingly, Plaintiffs and members of the

10   Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

11   121.    California: During the Class Period, Qualcomm engaged in monopolistic and

12   anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of

13   California Business and Professions Code sections 16700, *et seq*.  While Section 16700 does

14   not reach solely unilateral conduct by a monopolist, it encompasses agreements between a

15   monopolist and its customers where the monopolist effectively coerces the customer to accede

16   to the restraint in order to obtain the good or service that is the subject of the agreement.  That

17   is what happened here.  Despite its FRAND obligations, Qualcomm unilaterally imposed

18   royalty rates that were unreasonable and exceeded what it could have obtained in a true

19   FRAND negotiation.  This conduct constitutes a "combination" under the Cartwright Act.

20   122.    Qualcomm established an unlawful scheme by which it acquired and

21   maintained monopoly power in the Cellular Device Components through anticompetitive

22   means, including by excluding competition.

23   123.    The Relevant Cellular Devices are commodities.

24   124.    As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class

25   were overcharged when they purchased their Relevant Cellular Devices.

26   125.    District of Columbia: Qualcomm's monopolization and anticompetitive

27   conduct has restrained trade in violation of District of Columbia Code Annotated §§ 28-4501,

28   *et seq*.  During the Class Period, Qualcomm's illegal conduct substantially affected District of

1    Columbia commerce.  As a direct and proximate result of Qualcomm's unlawful conduct,

2    Plaintiffs and members of the Damages Class have been injured in their business and property

3    and are threatened with further injury.  By reason of the foregoing, Qualcomm has

4    monopolized in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501,

5    *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief

6    available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

7          126.    <u>Illinois</u>: Qualcomm's monopolization and anticompetitive conduct has

8    restrained trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1,

9    *et seq.*).  During the Class Period, Qualcomm's illegal conduct substantially affected Illinois

10   commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and

11   members of the Damages Class have been injured in their business and property and are

12   threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

13   restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1,

14   *et seq.*).  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief

15   available under District of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et*

16   *seq.*).

17         127.    <u>Iowa</u>: Qualcomm's monopolization and anticompetitive conduct has restrained

18   trade in violation of Iowa Code §§ 553.1, *et seq.*  During the Class Period, Qualcomm's

19   illegal conduct substantially affected Illinois commerce.  As a direct and proximate result of

20   Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been

21   injured in their business and property and are threatened with further injury.  By reason of the

22   foregoing, Qualcomm has monopolized in restraint of trade in violation of Iowa Code §§

23   553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of

24   relief available under Iowa Code §§ 553, *et seq.*

25         128.    <u>Kansas</u>: Qualcomm's monopolization and anticompetitive conduct has

26   restrained trade in violation of Defendant has entered into an unlawful agreement in restraint

27   of trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq.*  During the Class

28   Period, Qualcomm's illegal conduct substantially affected Kansas commerce.  As a direct and

38

1  proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages

2  Class have been injured in their business and property and are threatened with further injury.

3  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of

4  Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages

5  Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

6      129.   Maine: Qualcomm's monopolization and anticompetitive conduct has

7  restrained trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, *et*

8  *seq.*).  During the Class Period, Qualcomm's illegal conduct substantially affected Maine

9  commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and

10 members of the Damages Class have been injured in their business and property and are

11 threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

12 restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly,

13 Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat.

14 Ann. 10, §§ 1101, *et seq.*

15     130.   Michigan: Qualcomm's monopolization and anticompetitive conduct has

16 restrained trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

17 During the Class Period, Qualcomm's illegal conduct substantially affected Michigan

18 commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and

19 members of the Damages Class have been injured in their business and property and are

20 threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

21 restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly,

22 Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp.

23 Laws Ann. §§ 445.771, *et seq.*

24     131.   Minnesota: Qualcomm's monopolization and anticompetitive conduct has

25 restrained trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq.*  During the

26 Class Period, Qualcomm's illegal conduct substantially affected Minnesota commerce.  As a

27 direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

28 Damages Class have been injured in their business and property and are threatened with

1    further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

2    violation of Minnesota Stat. §§ 325D.49, *et seq*.  Accordingly, Plaintiffs and members of the

3    Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

4         132.    <u>Mississippi</u>: Qualcomm's monopolization and anticompetitive conduct has

5    restrained trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq.*  During the

6    Class Period, Qualcomm's illegal conduct substantially affected Mississippi commerce.  As a

7    direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

8    Damages Class have been injured in their business and property and are threatened with

9    further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

10   violation of Mississippi Code Ann. § 75-21-1, *et seq.*  Accordingly, Plaintiffs and members of

11   the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

12        133.    <u>Nebraska</u>: Qualcomm's monopolization and anticompetitive conduct has

13   restrained trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  During the Class

14   Period, Qualcomm's illegal conduct substantially affected Nebraska commerce.  As a direct

15   and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

16   Damages Class have been injured in their business and property and are threatened with

17   further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

18   violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and

19   members of the Damages Class seek all relief available under Nebraska Revised Statutes §§

20   59-801, *et seq.*

21        134.    <u>Nevada</u>: Qualcomm's monopolization and anticompetitive conduct has

22   restrained trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

23   During the Class Period, Qualcomm's illegal conduct substantially affected Nevada

24   commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and

25   members of the Damages Class have been injured in their business and property and are

26   threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

27   restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.* Accordingly,

28

CLASS ACTION COMPLAINT

1 Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat.
2 Ann. §§ 598A, *et seq.*

3      135. <u>New Hampshire</u>: Qualcomm's monopolization and anticompetitive conduct
4 has restrained trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* During
5 the Class Period, Qualcomm's illegal conduct substantially affected New Hampshire
6 commerce. As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and
7 members of the Damages Class have been injured in their business and property and are
8 threatened with further injury. By reason of the foregoing, Qualcomm has monopolized in
9 restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.*
10 Accordingly, Plaintiffs and members of the Damages Class seek all relief available under
11 New Hampshire Revised Statutes §§ 356:1, *et seq.*

12      136. <u>New Mexico</u>: Qualcomm's monopolization and anticompetitive conduct has
13 restrained trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq.* During the
14 Class Period, Qualcomm's illegal conduct substantially affected New Mexico commerce. As
15 a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the
16 Damages Class have been injured in their business and property and are threatened with
17 further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in
18 violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and members
19 of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

20      137. <u>New York</u>: Qualcomm's monopolization and anticompetitive conduct has
21 restrained trade in violation of New York General Business Laws §§ 340, *et seq.* During the
22 Class Period, Qualcomm's illegal conduct substantially affected New York commerce. As a
23 direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the
24 Damages Class have been injured in their business and property and are threatened with
25 further injury. By reason of the foregoing, Qualcomm has monopolized in restraint of trade in
26 violation of the New York Donnelly Act, §§ 340, *et seq.* Accordingly, Plaintiffs and members
27 of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*
28

1      138.    <u>North Carolina</u>: Qualcomm's monopolization and anticompetitive conduct has

2    restrained trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*  During

3    the Class Period, Qualcomm's illegal conduct substantially affected North Carolina

4    commerce.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and

5    members of the Damages Class have been injured in their business and property and are

6    threatened with further injury.  By reason of the foregoing, Qualcomm has monopolized in

7    restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.  Accordingly,

8    Plaintiffs and members of the Damages Class seek all relief available under North Carolina

9    Gen. Stat. §§ 75-1, *et. seq*.

10      139.    <u>North Dakota</u>: Qualcomm's monopolization and anticompetitive conduct has

11    restrained trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*.  During the

12    Class Period, Qualcomm's illegal conduct substantially affected North Dakota commerce.  As

13    a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

14    Damages Class have been injured in their business and property and are threatened with

15    further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

16    violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*.  Accordingly, Plaintiffs and

17    members of the Damages Class seek all relief available under North Dakota Cent. Code §§

18    51-08.1-01, *et seq*.

19      140.    <u>Oregon</u>: Qualcomm's monopolization and anticompetitive conduct has

20    restrained trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.  During the Class

21    Period, Qualcomm's illegal conduct substantially affected Oregon commerce.  As a direct and

22    proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages

23    Class have been injured in their business and property and are threatened with further injury.

24    By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of

25    Oregon Revised Statutes §§ 646.705, *et seq*.  Accordingly, Plaintiffs and members of the

26    Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

27      141.    <u>South Dakota</u>: Qualcomm's monopolization and anticompetitive conduct has

28    restrained trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq*. During the

1    Class Period, Qualcomm's illegal conduct substantially affected South Dakota commerce.  As

2    a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

3    Damages Class have been injured in their business and property and are threatened with

4    further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

5    violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*.  Accordingly, Plaintiffs and

6    members of the Damages Class seek all relief available under South Dakota Codified Laws

7    Ann. §§ 37-1, *et seq*.

8         142.    Tennessee: Qualcomm's monopolization and anticompetitive conduct has

9    restrained trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq*.  During the

10   Class Period, Qualcomm's illegal conduct substantially affected Tennessee commerce.  As a

11   direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

12   Damages Class have been injured in their business and property and are threatened with

13   further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

14   violation of Tennessee Code Ann. §§ 47-25-101, *et seq*.  Accordingly, Plaintiffs and members

15   of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et

16   seq*.

17        143.    Utah: Qualcomm's monopolization and anticompetitive conduct has restrained

18   trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*.  During the Class Period,

19   Qualcomm's illegal conduct substantially affected Utah commerce.  As a direct and proximate

20   result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have

21   been injured in their business and property and are threatened with further injury.  By reason

22   of the foregoing, Qualcomm has monopolized in restraint of trade in violation of Utah Code

23   Annotated §§ 76-10-911, *et seq*. Accordingly, Plaintiffs and members of the Damages Class

24   seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

25        144.    Vermont: Qualcomm's monopolization and anticompetitive conduct has

26   restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*.  During the Class

27   Period, Qualcomm's illegal conduct substantially affected Vermont commerce.  As a direct

28   and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

43

1   Damages Class have been injured in their business and property and are threatened with

2   further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

3   violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*.  Accordingly, Plaintiffs and members of

4   the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

5   145.   <u>West Virginia</u>: Qualcomm's monopolization and anticompetitive conduct has

6   restrained trade in violation of West Virginia Code §§ 47-18-1, *et seq*.  During the Class

7   Period, Qualcomm's illegal conduct substantially affected West Virginia commerce.  As a

8   direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the

9   Damages Class have been injured in their business and property and are threatened with

10  further injury.  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in

11  violation of West Virginia Code §§ 47-18-1, *et seq*.  Accordingly, Plaintiffs and members of

12  the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

13  146.   <u>Wisconsin</u>: Qualcomm's monopolization and anticompetitive conduct has

14  restrained trade in violation of Wisconsin Statutes §§ 133.01, *et seq*.  During the Class Period,

15  Qualcomm's illegal conduct substantially affected Wisconsin commerce.  As a direct and

16  proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages

17  Class have been injured in their business and property and are threatened with further injury.

18  By reason of the foregoing, Qualcomm has monopolized in restraint of trade in violation of

19  Wisconsin Stat. §§ 133.01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class

20  seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

21  147.   Plaintiffs and members of the Damages Class in each of the above states have

22  been injured in their business and property by reason of Qualcomm's unlawful

23  monopolization.  Plaintiffs and members of the Damages Class have paid more for Relevant

24  Cellular Devices than they otherwise would have paid in the absence of Qualcomm's

25  unlawful conduct.  This injury is of the type the antitrust laws of the above states were

26  designed to prevent and flows from that which makes Qualcomm's conduct unlawful.

27

28

148.    In addition, Qualcomm has profited significantly from the aforesaid monopolization.  Qualcomm's profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

149.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## FIFTH CLAIM FOR RELIEF

### Violation of State Consumer Protection Statutes

150.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

151.    In the event that the Court does not apply California law on a nationwide basis, Plaintiffs allege the following violations of state antitrust and restraint of trade laws in the alternative.

152.    Qualcomm engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

153.    Arkansas: Qualcomm has monopolized through unfair, unconscionable, and/or deceptive practices in violation of the Arkansas Code Annotated, § 4-88-101, *et. seq.* Qualcomm knowingly acted in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Relevant Cellular Devices were sold, distributed, or obtained in Arkansas.  The aforementioned conduct on the part of Qualcomm constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Qualcomm's unlawful conduct had the following effects: (1) price competition for the Cellular Device Components restrained, suppressed, and eliminated throughout Arkansas; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were

45

1    deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class

2    paid supracompetitive, artificially inflated prices for Relevant Cellular Devices.  During the

3    Class Period, Qualcomm's illegal conduct substantially affected Arkansas commerce and

4    consumers.  As a direct and proximate result of the unlawful conduct of Qualcomm, Plaintiffs

5    and members of the Damages Class have been injured in their business and property and are

6    threatened with further injury.  Qualcomm has engaged in unfair competition or unfair or

7    deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and,

8    accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

9    statute.

10           154.    California: Qualcomm has engaged in unfair competition or unfair,

11   unconscionable, deceptive or fraudulent acts or practices in violation of California Business

12   and Professions Code § 17200, et seq.  During the Class Period, Qualcomm committed and

13   continue to commit acts of unfair competition as defined by Sections 17200, et seq. of the

14   California Business and Professions Code, by engaging in the acts and practices specified

15   above.  This claim is instituted pursuant to Sections 17203 and 17204 of the California

16   Business and Professions Code, to obtain restitution from Qualcomm for acts, as alleged

17   herein, that violated Section 17200 of the California Business and Professions Code,

18   commonly known as the Unfair Competition Law.  Qualcomm's conduct as alleged herein

19   violated Section 17200.  The acts, omissions, misrepresentations, practices and non-

20   disclosures of Qualcomm, as alleged herein, constituted a common, continuous, and

21   continuing course of conduct of unfair competition by means of unfair, unlawful, and/or

22   fraudulent business acts or practices within the meaning of California Business and

23   Professions Code §17200, et seq., including, but not limited to, the following:  (1) the

24   violations of the Sherman Act, as set forth above; (2) the violations of Section 16720, et seq.

25   of the California Business and Professions Code, set forth above.  The illegal conduct alleged

26   herein is continuing and there is no indication that Qualcomm will not continue such activity

27   into the future.  The unlawful and unfair business practices of Qualcomm, as described above,

28   have caused and continue to cause Plaintiffs and members of the Damages Class to pay

1  supracompetitive and artificially-inflated prices for Relevant Cellular Devices.  Plaintiffs and

2  members of the Damages Class suffered injury in fact and lost money or property as a result

3  of such unfair competition.  Plaintiffs and members of the Damages Class are accordingly

4  entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings,

5  profits, compensation, and benefits that may have been obtained by Qualcomm as a result of

6  such business practices, pursuant to the California Business and Professions Code, §§ 17203

7  and 17204.

8        155.   <u>District of Columbia</u>:  Qualcomm has engaged in unfair competition or unfair,

9  unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-

10  3901, *et seq*.  Qualcomm acted in restraint of trade or commerce by affecting, fixing,

11  controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which

12  Relevant Cellular Devices were sold, distributed or obtained in the District of Columbia.  The

13  foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code §

14  28-3904.  The suppression of competition that has resulted from Qualcomm's conduct has

15  ultimately resulted in unconscionably higher prices for purchasers so that there was a gross

16  disparity between the price paid and the value received for the Relevant Cellular Devices.

17  Qualcomm's unlawful conduct had the following effects: (1) Relevant Cellular Devices price

18  competition was restrained, suppressed, and eliminated throughout the District of Columbia;

19  (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at

20  artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the

21  Damages Class were deprived of free and open competition; and (4) Plaintiffs and members

22  of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular

23  Devices.  As a direct and proximate result of Qualcomm's conduct, Plaintiffs and members of

24  the Damages Class have been injured and are threatened with further injury.  Defendant has

25  engaged in unfair competition or unfair or deceptive acts or practices in violation of District

26  of Columbia Code § 28-3901, *et seq*., and, accordingly, Plaintiffs and members of the

27  Damages Class seek all relief available under that statute.

28

156.    <u>Florida</u>: Qualcomm has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*  Qualcomm's unlawful conduct had the following effects:  (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout Florida; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices.  During the Class Period, Qualcomm's illegal conduct substantially affected Florida commerce and consumers.  As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.  Qualcomm has engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

157.    <u>Missouri</u>: Qualcomm has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*  Plaintiffs and members of the Damages Class purchased Relevant Cellular Devices for personal or family purposes.  Qualcomm engaged in the conduct described herein in connection with the sale of Relevant Cellular Devices in trade or commerce in a market that includes Missouri.  Qualcomm affected, fixed, controlled, and/or maintained, at artificial and non-competitive levels, the prices at which Relevant Cellular Devices were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.  Qualcomm concealed, suppressed, and omitted to disclose material facts to SSOs concerning its unlawful activities and suppressed, and omitted facts would have been important to SSOs as they related to selecting Qualcomm's

1    technologies into their standards.  Qualcomm's unlawful conduct had the following effects:

2    (1) price competition was restrained, suppressed, and eliminated throughout Missouri; (2)

3    prices of Relevant Cellular Devices were raised, fixed, maintained, and stabilized at

4    artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class

5    were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

6    Class paid supracompetitive, artificially inflated prices for the Relevant Cellular Devices. The

7    foregoing acts and practices constituted unlawful practices in violation of the Missouri

8    Merchandising Practices Act.  As a direct and proximate result of the above-described

9    unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss

10   of money or property.  Accordingly, Plaintiffs and members of the Damages Class seek all

11   relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. §

12   407.020, which prohibits "the act, use or employment by any person of any deception, fraud,

13   false pretense, false promise, misrepresentation, unfair practice or the concealment,

14   suppression, or omission of any material fact in connection with the sale or advertisement of

15   any merchandise in trade or commerce…," as further interpreted by the Missouri Code of

16   State Regulations, 15 CSR 60-7.010, *et seq*., 15 CSR 60-8.010, *et seq*., and 15 CSR 60-9.010,

17   *et seq*., and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

18           158.    <u>Montana</u>: Qualcomm has engaged in unfair competition or unfair,

19   unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade

20   Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq*., and §§

21   30-14-201, *et. seq*.  Qualcomm's unlawful conduct had the following effects:  (1) price

22   competition was restrained, suppressed, and eliminated throughout Montana; (2) prices of

23   Relevant Cellular Devices were raised, fixed, maintained, and stabilized at artificially high

24   levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived

25   of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

26   supracompetitive, artificially inflated prices for Relevant Cellular Devices.  During the Class

27   Period, Qualcomm's illegal conduct described herein substantially affected Montana

28   commerce and consumers.  As a direct and proximate result of Qualcomm's unlawful

1   conduct, Plaintiffs and members of the Damages Class have been injured and are threatened

2   with further injury.  Qualcomm has engaged in unfair competition or unfair or deceptive acts

3   or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et seq.*, and,

4   accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

5   statute.

6          159.    <u>New Mexico</u>: Qualcomm has engaged in unfair competition or unfair,

7   unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1,

8   *et seq*.  Qualcomm acted in restraint of trade or commerce by affecting, fixing, controlling

9   and/or maintaining at non-competitive and artificially inflated levels, the prices at which

10  Relevant Cellular Devices were sold, distributed or obtained in New Mexico.  The

11  aforementioned conduct on the part of the Defendant constituted "unconscionable trade

12  practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted

13  in a gross disparity between the value received by Plaintiffs and members of the Damages

14  Class and the prices paid by them for Relevant Cellular Devices as set forth in N.M.S.A., §

15  57-12-2E.  Qualcomm's conduct with regard to sales of Relevant Cellular Devices, including

16  their illegal conduct to fix the price of Relevant Cellular Devices at supracompetitive levels,

17  was substantively unconscionable because it was one-sided and unfairly benefited Defendant

18  at the expense of Plaintiffs and the public.  The suppression of competition that has resulted

19  from Qualcomm's conduct has ultimately resulted in unconscionably higher prices for

20  consumers so that there was a gross disparity between the price paid and the value received

21  for the Relevant Cellular Devices.  Qualcomm's unlawful conduct had the following effects:

22  (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated

23  throughout New Mexico; (2) Relevant Cellular Devices prices were raised, fixed, maintained,

24  and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members

25  of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and

26  members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant

27  Cellular Devices.  During the Class Period, Qualcomm's illegal conduct substantially affected

28  New Mexico commerce and consumers.  As a direct and proximate result of the unlawful

1    conduct of Qualcomm, Plaintiffs and members of the Damages Class have been injured and

2    are threatened with further injury.  Qualcomm has engaged in unfair competition or unfair or

3    deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and,

4    accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

5    statute.

6         160.    New York: Qualcomm has engaged in unfair competition or unfair,

7    unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et*

8    *seq*.  Qualcomm acted in restraint of trade or commerce by affecting, fixing, controlling

9    and/or maintaining, at artificial and non-competitive levels, the prices at which Relevant

10   Cellular Devices were sold, distributed or obtained in New York.  Because of Qualcomm's

11   unlawful trade practices in the State of New York, New York class members who indirectly

12   purchased Relevant Cellular Devices were misled to believe that they were paying a fair price

13   for Relevant Cellular Devices or the price increases for Relevant Cellular Devices were for

14   valid business reasons; and similarly situated consumers were potentially affected by

15   Qualcomm's conduct.  Qualcomm knew that its unlawful trade practices with respect to

16   pricing Relevant Cellular Devices would have an impact on New York consumers and not just

17   Qualcomm's direct customers.  Qualcomm knew that its unlawful trade practices with respect

18   to its royalties and other encumbrances on Relevant Cellular Devices would have a broad

19   impact, causing consumer class members who indirectly purchased Relevant Cellular Devices

20   to be injured by paying more for Relevant Cellular Devices than they would have paid in the

21   absence of Qualcomm's unlawful trade acts and practices.  Qualcomm's conduct described

22   herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y.

23   Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the

24   public at large, and harmed the public interest of New York State in an honest marketplace in

25   which economic activity is conducted in a competitive manner.  Qualcomm's unlawful

26   conduct had the following effects:  (1) Relevant Cellular Devices price competition was

27   restrained, suppressed, and eliminated throughout New York; (2) Relevant Cellular Devices

28   prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New

1  York; (3) Plaintiffs and members of the Damages Class were deprived of free and open

2  competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive,

3  artificially inflated prices for Relevant Cellular Devices.  Qualcomm's illegal conduct

4  substantially affected New York commerce and consumers, and accordingly Plaintiffs and

5  members of the Damages Class seek all relief available under N.Y. Gen. Bus. Law § 349(h).

6       161.   <u>North Carolina</u>: Qualcomm has engaged in unfair competition or unfair,

7  unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-

8  1.1, *et seq*.  Qualcomm acted in restraint of trade or commerce by affecting, fixing,

9  controlling and/or maintaining, at artificial and non-competitive levels, the prices at which

10  Relevant Cellular Devices were sold, distributed or obtained in North Carolina. Qualcomm's

11  conduct could not have succeeded absent deceptive conduct by Qualcomm to cover up its

12  illegal acts.  Qualcomm's conduct described herein constitutes consumer-oriented deceptive

13  acts or practices within the meaning of North Carolina law, which resulted in consumer injury

14  and broad adverse impact on the public at large, and harmed the public interest of North

15  Carolina consumers in an honest marketplace in which economic activity is conducted in a

16  competitive manner.  Qualcomm's unlawful conduct had the following effects:  (1) Relevant

17  Cellular Devices price competition was restrained, suppressed, and eliminated throughout

18  North Carolina; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and

19  stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of

20  the Damages Class were deprived of free and open competition; and (4) Plaintiffs and

21  members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant

22  Cellular Devices.  During the Class Period, Qualcomm's illegal conduct substantially affected

23  North Carolina commerce and consumers.  Plaintiffs and members of the Damages Class seek

24  actual damages for their injuries caused by these violations in an amount to be determined at

25  trial and are threatened with further injury.  Qualcomm has engaged in unfair competition or

26  unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.,

27  and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under

28  that statute.

CLASS ACTION COMPLAINT

162.    Rhode Island: Qualcomm has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1, *et seq*.).  Members of this Damages Class purchased Relevant Cellular Devices for personal, family, or household purposes.  Qualcomm acted in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Relevant Cellular Devices were sold, distributed, or obtained in Rhode Island.  Qualcomm's unlawful conduct had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices.  As a direct and proximate result of Qualcomm's violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Qualcomm's use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Qualcomm's willful and deceptive conduct, as described herein.  Qualcomm has engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

163.    South Carolina: Qualcomm has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, *et seq*.).  Qualcomm's monopolization as described herein had the following effects: (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

1    supracompetitive, artificially inflated prices for the Relevant Cellular Devices during the

2    Class Period.  Qualcomm's illegal conduct had a substantial effect on South Carolina

3    commerce during the Class Period.  As a direct and proximate result of Qualcomm's unlawful

4    conduct, Plaintiffs and members of the Damages Class have been injured in their business and

5    property and are threatened with further injury.  Qualcomm has engaged in unfair competition

6    or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq*., and,

7    accordingly, Plaintiffs and the members of the Damages Class seek all relief available under

8    that statute.

9        164.    <u>Vermont</u>: Qualcomm has engaged in unfair competition and/or unfair,

10    unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq*.

11    Qualcomm acted in restraint of trade or commerce in a market that includes Vermont, by

12    affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the

13    prices at which Relevant Cellular Devices were sold, distributed, or obtained in Vermont.

14    Qualcomm's unlawful conduct had the following effects: (1) Relevant Cellular Devices price

15    competition was restrained, suppressed, and eliminated throughout Vermont; (2) Relevant

16    Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels

17    throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free

18    and open competition; and (4) Plaintiffs and members of the Damages Class paid

19    supracompetitive, artificially inflated prices for the Relevant Cellular Devices.  As a direct

20    and proximate result of Qualcomm's violations of law, Plaintiffs and members of the

21    Damages Class suffered an ascertainable loss of money or property.  That loss was caused by

22    Qualcomm's willful and deceptive conduct, as described herein.  Qualcomm's misleading

23    conduct and unconscionable activities constitutes unfair competition and/or unfair or

24    deceptive acts or practices in violation of 9 Vermont § 2451, *et seq*., and, accordingly,

25    Plaintiffs and members of the Damages Class seek all relief available under that statute.

26                       **<u>SIXTH CLAIM FOR RELIEF</u>**

27                          **Unjust Enrichment**

28        165.     Plaintiffs repeats the allegations set forth above as if fully set forth herein.

166.   As a result of its unlawful conduct described above, Defendant Qualcomm has and will continue to be unjustly enriched.  Qualcomm has been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits related to the Relevant Cellular Devices.

167.   Qualcomm has benefited from its unlawful acts and it would be inequitable for it to be permitted to retain any of the ill-gotten gains resulting from its unlawful practices during the Class Period.

168.   Plaintiffs and members of the Damages Class are entitled to the amount of Qualcomm's ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct.  Plaintiffs and members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment that:

1.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.   That the unlawful conduct alleged herein constituted a violation of Sections 2 and 3(b) of the Sherman Act, and the state antitrust and consumer protection laws set forth herein;

3.   Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state antitrust and consumer protection laws, and that a joint and several judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendant Qualcomm in an amount to be trebled to the extent such laws permit;

1    4.    Plaintiffs and members of the Damages Class recover damages, to the

2    maximum extent allowed by such laws, in the form of restitution and/or disgorgement of

3    profits unlawfully gained from them;

4    5.    Defendant, its affiliates, successors, transferees, assignees and other

5    officers, directors, partners, agents and employees thereof, and all other persons acting or

6    claiming to act on their behalf or in concert with them, be permanently enjoined and

7    restrained from in any manner continuing, maintaining or renewing the conduct alleged

8    herein, or from committing any other conduct having a similar purpose or effect, and from

9    adopting or following any practice, plan, program, or device having a similar purpose or

10   effect;

11   6.    Plaintiffs and members of the Damages Class be awarded restitution,

12   including disgorgement of profits Defendant obtained as a result of their acts of unfair

13   competition and acts of unjust enrichment;

14   7.    Plaintiffs and members of the Classes be awarded pre- and post-

15   judgment interest as provided by law, and that such interest be awarded at the highest legal

16   rate from and after the date of service of this Complaint;

17   8.    Plaintiffs and members of the Classes recover their costs of suit,

18   including reasonable attorneys' fees, as provided by law; and

19   9.    Plaintiffs and members of the Classes have such other and further relief

20   as the case may require and the Court may deem just and proper.

## JURY DEMAND

22   Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

23   Civil Procedure, of all issues so triable.

24

25   Dated: February 9, 2017                    Respectfully submitted,

26

27                                  By:    _____/s/ Christopher Lebsock_____

28                                      Michael P. Lehmann (SBN 77152)
                                        Christopher L. Lebsock (SBN 184546)

                                        56

Bonny E. Sweeney (SBN 176174)
Bruce J. Wecker (SBN 78530)
Samantha J. Stein (SBN 302034)
**HAUSFELD LLP**
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeld.com
Email: clebsock@hausfeld.com
Email: bsweeney@hausfeld.com
Email: bwecker@hausfeld.com
Email: sstein@hausfeld.com

Michael D. Hausfeld
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel: (202)-540-7200
Fax: (202)-540-7201
Email: mhausfeld@hausfeld.com

Eugene A. Spector
Jeffrey L. Kodroff
William G. Caldes
Jonathan M. Jagher
Len A. Fisher
**SPECTOR ROSEMAN KODROFF & WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel:     (215) 496-0300
Fax:     (215) 496-6611
Email: ESpector@srkw-law.com
Email: JKodroff@srkw-law.com
Email: BCaldes@srkw-law.com
Email: JJagher@srkw-law.com
Email: LFisher@srkw-law.com

*Attorneys for Plaintiffs*